*AC*

**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN 1 7 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 07 CR 314 -**2** |
| | ) | |
| ROLAND HARPER | ) | Judge Darrah |

## PLEA AGREEMENT

1.    This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant ROLAND HARPER, and his attorney, PATRICK COTTER, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(B), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.    The superseding information in this case charges defendant with mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2.

3.    Defendant has read the charge against him contained in the superseding information, and that charge has been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crime with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the superseding information. The superseding information charges defendant with com-

mitting mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

### Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the superseding information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than February 2003, and continuing until in or about September 2006, in Chicago and elsewhere within the Northern District of Illinois, Eastern Division, defendant ROLAND HARPER, together with co-defendant Aidan Monahan and others, devised, intended to devise and participated in a scheme and artifice to defraud and to obtain money and property, including contracts calling for payments in excess of $1.5 million, as well as funds actually paid pursuant to those contracts, from the Chicago Public Schools, by means of materially false and fraudulent pretenses, representations and promises, and material omissions, which scheme is further described below.

A.     Persons and Entities Involved.

Monahan Landscape Company, Incorporated ("Monahan Landscape") was a landscape, construction and maintenance company located in Arlington Heights, Illinois. Co-defendant Aidan E. Monahan was the President of Monahan Landscape Company.

2

Rohar Construction ("Rohar") was a trucking company based in Chicago, Algonquin and Arlington Heights, Illinois. Defendant ROLAND HARPER was the President of Rohar.

The Chicago Public Schools ("CPS"), operated elementary schools and high schools in Chicago. CPS purchased a wide variety of commodities essential for the day-to-day operation of the school system. It also managed construction-related projects pertaining to its physical facilities.

B.    The CPS Sheltered Market Program.

In 1991, the CPS adopted a "Remedial Plan" which was designed to assist business enterprises owned by minorities and women and to provide for the participation of such enterprises in the CPS's procurement of goods and services. The Remedial Plan defined a Minority Business Enterprise ("MBE") as a business that is "owned and controlled by a Minority person or persons and that has its principal place of business within the six-county Chicago Metropolitan Statistical Area." An MBE was further defined as a business awarded certification by the City of Chicago as a minority owned and controlled business, authorized to perform in its Certified Area of Specialty. The Remedial Plan also defined a WBE, or Woman's Business Enterprise.

The CPS assigned landscaping work by six geographical regions (Regions One through Six) and one city-wide region for campus parks and athletic fields. In 2002, the CPS decided to solicit bids for landscaping maintenance services in two separate bid solicitations,

an "open market" solicitation and a "sheltered market" solicitation available only to MBEs or WBEs.

C.    The 2003 Sheltered Market Solicitation.

In or about February 2003, the Board issued a request for bids for the Sheltered Market Landscape Maintenance Work Solicitation ("2003 Sheltered Market Solicitation"). Under the terms of the solicitation, the vendor was required to provide landscape mainten-ance services at those schools located in Regions Two, Three and Four that had 20,000 square feet of green space or more. Landscape maintenance services were to include cutting grass, pruning trees and shrubs, cultivating beds, fertilizing, and weed and insect control as needed.

The 2003 Sheltered Market Solicitation specified that only firms certified by the City of Chicago's Certification Program (i.e., a business awarded certification by the City of Chicago as a minority or woman owned and controlled business, authorized to perform in its Certified Area of Specialty) would be considered for award of the contract. The 2003 Sheltered Market Solicitation required bidders to submit a letter from the City of Chicago certifying the bidder as an MBE or WBE in good standing.

The 2003 Sheltered Market Solicitation required that the bidder adhere to a minimum requirement that at least 50% of the dollar amount of each job be performed by the "Prime Contractor" (the MBE or WBE that was awarded the contract). An additional 25% was to be performed by MBEs and/or WBEs, giving an overall MBE and/or WBE participation of

4

75%. The remaining 25% of the contract could be subcontracted to businesses that were not certified as MBEs or WBEs. The 2003 Sheltered Market Solicitation required bidders to submit, among other documents, a "compliance demonstration" setting forth the manner in which the bidder would comply with the solicitation requirements. Pursuant to the terms of the solicitation, bidders were evaluated on various criteria, including compliance with the MBE/WBE goals set forth in the solicitation, the quality of the proposed MBE/WBE Plan, and submission of all of the required completed documents.

According to the Remedial Plan, to be eligible for participation credit, an MBE was required to be an independent business serving a commercially independent function. The Remedial Plan defined a "commercially independent function" to mean that the MBE must execute a distinct element of work by actual performance, management and supervision. The Remedial Plan further required that the bidder not be a "pass-through" for firms not certified as an MBE or WBE.

D.   Monahan Landscape Company's Background with CPS.

From on or about April 1, 2000, through March 31, 2003, Monahan Landscape was the primary contractor on the landscape maintenance contracts with CPS for all six regions. In addition to contracts for landscape maintenance, Monahan Landscape also had contracts with CPS for new landscaping and playlot maintenance. Between April 2000 and March 31, 2003, the CPS paid Monahan Landscape over $8.5 million for work performed pursuant to the contracts for landscape maintenance for all six regions.

Monahan Landscape was not an MBE or WBE. As such, Monahan Landscape was not eligible to submit a bid in response to the 2003 Sheltered Market Solicitation for landscape maintenance to be performed at Regions Two, Three and Four. In order to continue to perform the work for those regions, co-defendant Monahan, on behalf of Monahan Landscape, and defendant discussed whether Monahan Landscape could bid the contracts through Rohar, despite the fact that Rohar was incapable of performing a commercially independent function with respect to the landscaping work.

E.     Rohar's Background.

Rohar was first certified by the City of Chicago as an MBE in 1994. As part of Rohar's application to be certified as an MBE, defendant stated that he was responsible for day-to-day management decisions and business decisions. Defendant represented in the certification declaration affidavit that he was responsible for financial decisions, including signing checks, signing and co-signing for loans, surety bonding, major purchases or acquisitions, acquisitions of lines of credit, and signing contracts. Defendant further represented that he was responsible for management decisions such as estimating, marketing and sales operations, hiring and firing of management personnel, hiring and firing of non-management personnel, supervision of field/production, and supervision of office personnel.

Rohar originally worked as a contractor in the steel erection business. Defendant wanted to get into the trucking business and later the landscaping business, but did not have the money or experience to obtain large contracts. Defendant therefore tried to get more

6

experience and resources by making arrangements with established companies to do the work.

While Rohar was not certified as an MBE in landscaping, CPS accepted it as a bidder on the 2003 Sheltered Market Solicitation, and Rohar was in fact awarded contracts for three regions (the "Sheltered Market Contracts").

F.    Monahan's Use of Rohar to Receive the Sheltered Market Contracts.

Defendant ROLAND HARPER, with the agreement of co-defendant Monahan, falsely represented in contract bid documents submitted to the Chicago Public Schools by Rohar that Rohar was a Minority Business Enterprise that was controlled, managed and operated by a minority person when, in fact, Rohar acted (and was intended by defendant to act) as a "pass-through" for Monahan Landscape with respect to the Sheltered Market Contracts. Rohar did not, in fact, perform a commercially independent function under the Sheltered Market Contracts, nor did Rohar itself perform at least 50% of the work. Instead, Monahan Landscape, which was not certified as an MBE, was, at the direction of co-defendant Monahan, actually operating Rohar with respect to the Sheltered Market Contracts. As a result of the fraudulent scheme, Monahan Landscape obtained in excess of $1.5 million from the Chicago Public Schools.

G.    Rohar's Pattern of Operations.

In several  cases over the years, defendant arranged to have work that was awarded to Rohar as an MBE performed by companies that he understood were not certified as MBE's

7

or WBE's, but were in fact owned by white males. Defendant did not actively exercise control of Rohar at all times. For several projects, defendant, did not conduct or supervise all estimating, marketing, and sales operations, or the hiring and firing of personnel, or the supervision of office personnel, or the check signing.

Defendant understood that Rohar would not meet the requirements of the Sheltered Market Contracts at the time defendant submitted the bid, as well as when he submitted subsequent certifications that he was complying with the contract.

H.    The Award of the Sheltered Market Contracts.

Defendant did not prepare an independent bid for the Sheltered Market Contracts. Instead, defendant obtained information from the cost estimate from employees of Monahan Landscape, who prepared the fraudulent bid documents to be submitted to the Board on behalf of Rohar. Defendant did not provide the cost estimate for Rohar's bid.

On or about February 28, 2003, defendant, on behalf of Rohar, submitted a bid proposal to the Board to perform landscaping maintenance services for Regions Two, Three and Four pursuant to the 2003 Sheltered Market Solicitation. According to the proposal, Rohar would use two subcontractors, Monahan Landscape Company and Company B, an MBE. Pursuant to the bid requirements, Monahan Landscape Company was limited to performing no more than 25% of the landscape maintenance contract work.

On or about March 26, 2003, Rohar was awarded the Sheltered Market Contracts for Regions Two, Three and Four. The contract period was from April 1, 2003, through March

8

31, 2004, with the Board having two options to extend the agreement for additional one-year periods. On March 24, 2004, the Board exercised its option to extend the agreement for a term commencing on April 1, 2004 and ending on March 31, 2005. The Board subsequently amended the term of the option period to end on November 30, 2005.

During the time period beginning in April 2003 and continuing until approximately September 18, 2006, Rohar received more than $1.5 million from the CPS for landscape maintenance services performed as a prime contractor pursuant to the Sheltered Market Contracts. Although the Sheltered Market Contracts ended on November 30, 2005, invoices for work performed pursuant to the contract were submitted to the CPS after the date on which the contract terminated, and the CPS continued to make payments to Rohar through on or about September 18, 2006.

H.    Monahan's Control of Rohar.

Employees of Monahan Landscape supervised the performance of the work under the Sheltered Market Contracts. While defendant maintained an office at Monahan Landscape at 2525 East Oakton in Arlington Heights, defendant did not pay rent for the room and was rarely present. The room had a fax machine, defendant's signature stamp, and some papers. Defendant would go to the office about twice a week, say hello to the workers at Monahan Landscape, then meet with co-defendant Monahan. Typically, those meetings would not last long.

While landscaping employees were listed on Rohar's payroll, the employees were routinely hired and supervised by Monahan Landscape employees. Defendant did not choose the employees or manage their work. Employees of Monahan Landscape signed off on Rohar's maintenance logs submitted to the Board.

All administrative functions of Rohar were conducted by employees of Monahan Landscape, including preparing the payroll (until ADP began preparing the payroll), preparing invoices submitted to CPS, communicating with Rohar's business contacts, handling correspondence, issuing Rohar's payroll checks and maintaining and reconciling Rohar's bank accounts. Defendant brought mail and other correspondence related to the Sheltered Market Contracts to the offices of Monahan Landscape for handling. Defendant gave the mail addressed to Rohar to bookkeepers employed by Monahan Landscape for handling.

Defendant knowingly caused the submission of false statements to an agent of the Chicago Public Schools to conceal the fact that Rohar was acting as a pass-through on behalf of Monahan Landscape. An employee of Monahan Landscape prepared invoices on behalf of Rohar, along with the necessary supporting documentation. The documentation included certifications that contract requirements, including the MBE requirements, were met. After preparing the invoices, the employee contacted defendant to sign the invoices and the attachments. They were then submitted for payment to an agent of the Chicago Public Schools.

The checkbook for Rohar's bank account was maintained at the office of Moanhan Landscape. Defendant has reviewed records of Rohar's bank account. Defendant was not aware of many of the transfers of funds into and out of Rohar's account. Among the checks issued from Rohar's account were checks to Company C, a company owned by a relative of co-defendant Monahan, which had done no business with Rohar. Defendant was told by co-defendant Monahan that one $50,000 check was given to Company C from the Rohar account so that Company C could meet its payroll. Defendant understood that was a loan. Defendant did not know there were additional checks for $82,000 and $160,000 to Company C paid out of the Rohar account.

Most of the work in the Sheltered Market Contracts was performed with equipment that was either owned by Monahan Landscape, or was placed in the name of Rohar, but was actually controlled by Monahan Landscape, and reverted to the control of Monahan Landscape at the end of the Sheltered Market Contracts (with the exception of three vehicles that defendant took after the contracts ended). Rohar did not pay Monahan Landscape for use of its equipment. Rohar also did not pay Monahan Landscape for work performed by Moanhan Landscape's office employees.

I.     Compensation.

Defendant received a total of approximately $80,000 in compensation from Monahan Landscape for work performed under the Sheltered Market Contracts, and from additional work.

11

J.    Mailing.

On or about August 22, 2003, at Algonquin, in the Northern District of Illinois, defendant, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to delivered by mail according to the direction thereon an envelope containing CPS check number 2003298864, payable to Rohar in the amount of $110,390.75, that envelope being addressed to Rohar in Algonquin, Illinois, in violation of Title 18, United States Code, Sections 1341 and 2.

7.    The foregoing facts are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

8.    Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.    A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.    Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.     In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

9.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

b.     **Offense Level Calculations.**

i.     The base offense level for the charge in the superseding information is 7, pursuant to Guideline §2B1.1.

ii.     The parties agree that the loss amount exceeds $1,000,000, and that the offense level should be increased by 16 pursuant to Guideline § 2B1.1(b)(1)(I).

13

iii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine, restitution, or forfeiture that may be imposed in this case, a two-level reduction in the offense level is appropriate.

iv.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 20, which,

14

when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 33 to 41 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.    Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.    Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, the parties have agreed pursuant to Fed.R.Crim.P. 11(c)(1)(B) that certain components of those calculations – specifically, those set forth above in subparagraphs (b)(i) and (b)(ii) of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraphs.

g.    Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth

15

above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

11.     Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Only the United States Attorney for the Northern District of Illinois may require defendant's cooperation pursuant to this Plea Agreement. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

12.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then

16

the government shall move the Court, pursuant to Guideline §5Kl.l , to depart downward from the low end of the applicable guidelines range, and shall recommend a sentence of 50 percent of the low end of the applicable guidelines range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court.

13.     If the government does not move the Court, pursuant to Sentencing Guideline §5K1.1, to depart from the applicable Guideline range, as set forth above, the preceding two paragraphs of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to §5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline §5K1.1.

14.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Plea Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

15.     Regarding restitution, the parties acknowledge that the total amount of restitution owed to the Board of Education of the Chicago Public Schools is $25,000, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States

17

Code, § 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution in the amount outstanding at the time of sentencing. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing.

16.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

## Forfeiture

17.    The superseding information charges that defendant is liable to the United States, together with co-defendant Aidan Monahan, for at least $100,000, which funds are subject to forfeiture because those funds constitute proceeds of the violation alleged in the superseding information.

18.    Defendant agrees to the entry of a forfeiture judgment against him in the amount of $50,000. Defendant agrees to the entry of a preliminary order of forfeiture at any time prior to sentencing relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds so that these funds may be disposed of according to law. Defendant is unaware of any third party who has an ownership interest in, or claim to, the property subject to forfeiture.

19.    Defendant understands that forfeiture of any property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

### Presentence Investigation Report/Post-Sentence Supervision

20.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

21.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

19

22.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

23.    This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 314.

24.    This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District

of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

25.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Right to be charged by indictment.** Defendant understands that he has a right to have the charge prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members.  By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

b.    **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.    The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

21

        ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

        iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

        iv.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could

require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

c.    **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

23

d.      Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Other Terms

26.      Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

27.      Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

28.      Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute

24

defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29.    Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

30.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

31.    Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney.  Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: 6/17/08

PATRICK J. FITZGERALD
United States Attorney


BARRY MILLER
NANCY MILLER
Assistant U.S. Attorneys

ROLAND HARPER
Defendant


PATRICK COTTER
Attorney for Defendant

26